IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WENDY L. KLOTZ | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-589 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                November 21, 2023

Wendy L. Klotz ("Plaintiff") seeks review of the Commissioner's decision

denying her application for disability insurance benefits ("DIB").  For the reasons that

follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is

supported by substantial evidence.

I.      **PROCEDURAL HISTORY**

Plaintiff protectively filed for DIB on July 31, 2018, alleging that her disability

began on February 1, 2013,[1] as a result of fibromyalgia, major depression, anxiety,

myofascial pain syndrome, repetitive strain injury, and Hashimoto's Thyroiditis.  Tr. at

87, 166, 211.[2]  Plaintiff's application was denied initially, id. at 88-92, and she requested

a hearing before an ALJ, id. at 93-94, which took place on February 27, 2020.  Id. at 36-

---

[1]At the administrative hearing, Plaintiff amended her alleged onset date to her
fiftieth birthday, June 15, 2016.  Tr. at 67.  The ALJ acknowledged this amendment in
her decision, but noted that she was considering the period from Plaintiff's original
alleged onset date.  Id. at 16.

[2]To be entitled to DIB, Plaintiff must establish that she became disabled on or
before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The Certified Earning
Record indicates and the ALJ found that Plaintiff was insured through December 31,
2018.  Tr. at 18, 198.

68.  The ALJ found on March 19, 2020, that Plaintiff was not disabled.  Id. at 16-30.  On

December 9, 2020, the Appeals Council denied Plaintiff's request for review, id. at 1-3,

making the ALJ's March 19, 2020 decision the final decision of the Commissioner.  20

C.F.R. § 404.981.

Plaintiff commenced this action in federal court on February 8, 2021, Doc. 1, and

the matter is now fully briefed and ripe for review.  Docs. 10, 13.[3]

## II.   **LEGAL STANDARDS**

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected tolast for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.      Whether the claimant is currently engaged in
> substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe
> impairment" that significantly limits her physical or mental
> ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence,
> the impairment meets or equals the criteria of an impairment
> listed in the listing of impairments ("Listings"), 20 C.F.R. pt.
> 404, subpt. P, app. 1, which results in a presumption of
> disability;

---

[3]The case was originally assigned to the Honorable David R. Strawbridge.  Doc. 3.
Upon Judge Strawbridge's retirement, the case was reassigned to me.  Docs. 14 & 15.
The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).
See Standing Order, In RE:  Direct Assignment of Social Security Appeals to Magistrate
Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Docs. 4 & 16.

> 4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

> 5.    If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181

F.3d at 431.

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff suffered from the severe impairments of degenerative

joint disease ("DJD")/osteoarthritis, obesity, myofascial pain syndrome, anxiety, and

depression; and the non-severe impairments of chronic sinusitis, allergic rhinitis, irritable

bowel syndrome, hyperlipidemia, osteoporosis, a right elbow/shoulder/wrist injury, and a

right ankle fracture.  Tr. at 18-19.  The ALJ found Plaintiff's thyroid disorder to be non-

severe, and that the record was insufficient to establish fibromyalgia as a medically

determinable impairment, but the ALJ did consider Plaintiff's complaints of pain and

fatigue in her later analysis.  Id. at 19-20.  The ALJ found that Plaintiff did not have an

impairment or combination of impairments that met the Listings, id. at 20, and that she

had the RFC to perform light work, except that she could only occasionally stoop,

balance, kneel, climb ramps and stairs, or use her lower extremities for the operation of

foot controls; never crawl or climb ladders, ropes, or scaffolds; after standing/walking for

30 minutes, she needs to sit for 1 -to- 2 minutes, and after sitting for 60 minutes, she

needs to stand and stretch for 1 -to- 2 minutes, but can remain on task regardless of

posture; with no exposure to unprotected heights or unprotected moving mechanical

parts; occasional exposure to extreme cold; no driving as part of the job duties; and can

perform simple, routine tasks.  Id. at 21-22.  Based on the testimony of a vocational

expert ("VE"), the ALJ found that Plaintiff could not perform her past relevant work as a

chemist, but could perform the jobs of bench assembler, cashier, or visual inspector/sorter.  Id. at 29.  Therefore, the ALJ found that Plaintiff was not disabled.  Id. at 30.

Plaintiff claims that the ALJ did not properly evaluate the medical opinion evidence in determining her RFC and did not properly consider Plaintiff's subjective complaints.  Doc. 10.  Defendant responds that Plaintiff relies on the wrong standard in analyzing the ALJ's consideration of the opinion evidence and that the decision is supported by substantial evidence.  Doc. 13.

### B.   Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on June 15, 1966, and thus was 47 years old on her original alleged onset date of February 1, 2013, and 52 years old when her insured status expired on December 31, 2018.  Tr. at 166, 198.  At the administrative hearing, she testified that she has a doctorate degree in chemistry and has been a chemist and senior scientist.  Id. at 41.  Plaintiff's job as a chemist was eliminated on January 31, 2013, and she explained that she did not look for other work, prioritizing her health in the hopes that she could return to work without exacerbating her pain.  Id.  Her chronic pain interferes with her ability to work.  Id. at 42.  She has pain in her wrists, arms and neck due to a repetitive strain injury.  Id. at 43.  At the time of the hearing, she had recently undergone knee replacement surgery.  Id. at 45.  Prior to the surgery, Plaintiff testified that she could only walk short distances, had difficulty going up and down stairs and could not stand more than 5 -to- 10 minutes.  Id. at 45.  She has used a cane since it was prescribed in 2012

following a knee injury.  Id. at 52.[4]  Plaintiff reported several bad falls in the 8 years prior

to the hearing, the most recent in September of 2019.  Id. at 53.

Plaintiff also stated that she has pain in her lower back and hips, so she cannot sit

for more than 10 minutes and has to switch positions.  Tr. at 46.  She estimated she could

lift 5 pounds with one hand, but not repetitively.  Id.  Plaintiff testified that extra activity

aggravates her fibromyalgia pain.  Id. at 49.  She treats her fibromyalgia pain by lying

down, using a TENS unit, and participating in physical therapy.  Id.  On Lyrica,[5] Plaintiff

testified that the pain is a 3 out of 10.  Id. at 50.

Plaintiff suffers from Hashimoto's thyroiditis,[6] which she said had not been under

control for about a year prior to the hearing.  Tr. at 46-47.  The primary symptom is

fatigue.  Id. at 47.  Plaintiff sees her primary care physician for depression and anxiety

and described feeling "out of control" and having panic attacks when she is

overwhelmed.  Id. at 48.

Plaintiff also has sinus issues and allergies that are controlled by medication.  Tr.

at 58.  Plaintiff testified that Lyrica makes her drowsy and gives her dry mouth, dizzy

---

[4]Plaintiff also has a mobility scooter which she uses to "get around better . . . at
places like the mall," but it is not prescribed.  Tr. at 54.

[5]Lyrica (generic pregabalin) is an anticonvulsant also used to treat pain caused by
fibromyalgia or nerve pain in people with diabetes, herpes zoster, or spinal cord injury.
See https://www.drugs.com/lyrica.html (last visited Nov. 2, 2023); archived at
https://perma.cc/4DFZ-ANLW.

[6]Hashimoto's disease is "a progressive type of autoimmune thyroiditis with
lymphocytic infiltration of the gland and circulating antithyroid antibodies; patients have
goiter and gradually develop hypothyroidism."  Dorland's Illustrated Medical Dictionary,
32nd ed. ("DIMD"), at 535 (2012).

spells, and "brain fog," Zoloft[7] makes her tired and contributes to "brain fog," and

Zyrtec[8] makes her drowsy.  Id. at 55.  Plaintiff spends 12 hours in bed each night but only

sleeps 6 or 7 hours, getting up at 11:00 or noon, and most days takes naps during the day

for an hour or two.  Id. at 54-55.  She has also noticed forgetfulness and trouble

concentrating.  Id. at 56.  Plaintiff can bathe and dress herself and can operate a computer

but does not believe she could operate a computer regularly because it irritates her hands,

wrists, arms, and neck.  Id. at 57.

A VE classified Plaintiff's work as a chemist as light as generally performed, but

medium as Plaintiff performed it for one employer.  Tr. at 61.  The ALJ asked the VE to

consider someone of Plaintiff's age, education, and work experience, who was limited to

light work, who was capable of occasional stooping, balancing, kneeling and climbing

ramps and stairs; no crawling, climbing ladders, ropes or scaffolds; occasional use of the

lower extremities for use of foot controls; who, after standing and walking for 30 minutes

would need to sit for 1- to- 2 minutes, and who after sitting up to 60 minutes would need

to stand and stretch for 1 -to- 2 minutes, but can remain on task regardless of posture; and

the work should involve no exposure to unprotected heights or moving mechanical parts,

with only occasional exposure to extreme cold; and no driving as part of the job.  Id. at

61-62.  The VE identified the jobs of bench assembler, cashier, and visual

---

[7]Zoloft is an antidepressant.  See https://www.drugs.com/zoloft.html (last visited Nov. 2, 2023); archived at https://perma.cc/CDH8-2UAD.

[8]Zyrtec is an antihistamine used to treat cold or allergy symptoms.  See https://www.drugs.com/zyrtec.html (last visited Nov. 2, 2023); archived at https://perma.cc/Y92N-5UKY.

inspector/sorter.  Id. at 62.  The VE also offered that these jobs would accommodate someone limited to simple, routine, tasks.  Id. at 63.

### C.    Summary of the Medical Record

Plaintiff has a history of a left knee injury with a patellar realignment and anterior cruciate ligament ("ACL") reconstruction in 1993, which failed requiring a second reconstruction surgery in 2003.  See tr. at 324-25, 550, 631.  In June 2012, after a fall affecting the left knee, Plaintiff had an MRI which revealed a fracture of the posterior lateral aspect of the tibial plateau and chondromalacia patella.[9]  Id. at 324-25.  James L. Bumgardner, M.D., at Upper Bucks Orthopaedics, sent her for physical therapy.  Id. at 332, 553, 555.

Plaintiff again injured her left knee stepping off a curb in October 2014.  Tr. at 558.  An MRI showed that the ACL was intact, but she had a torn medial meniscus.  Id. Dr. Bumgardner performed left knee arthroscopy, partial medial and partial lateral meniscectomies[10] and debridement on October 23, 2014.  Id. at 560.  On November 18, 2014, Dr. Bumgardner found that Plaintiff's pain was well-controlled on non-steroidal anti-inflammatories and Tylenol, and Plaintiff was ambulating with a cane and complained of "a little throbbing pain in her knee if she is on her feet for a long period of time."  Id. at 562-63.  Dr. Bumgardner advised Plaintiff to "[f]ollow up as needed," and no further treatment notes are in the record regarding this injury.  Id. at 563.

---

[9]Chondromalacia patella is "pain and crepitus over the anterior aspect of the knee, particularly in flexion, with softening of the cartilage on the articular surface of the patella and, in later stages, effusion."  DIMD at 352.

[10]A meniscectomy is the "excision of an intra-articular meniscus."  DIMD at 1134.

On February 25, 2016, Plaintiff fell on her outstretched right arm, injuring her shoulder, elbow, and wrist. Tr. at 564. The following day, Steven E. Casey, M.D., from Upper Bucks Orthopaedics, evaluated her, found no fracture, and recommended a sling and exercises for Plaintiff's shoulders. Id. at 565. On March 7, 2016, Plaintiff reported to physicians' assistant ("PA") Angela Milham that her shoulder was improving, but she had "constant aching pain with some throbbing" in the elbow and wrist. Id. at 566. On April 18, 2016, PA Milham advised Plaintiff to start physical therapy on the right arm. Id. at 570. On June 6, 2016, Plaintiff reported better mobility of her right shoulder, elbow, and wrist, and that she no longer took anything for the pain, but continued to have pain in her wrist and elbow, worse in her wrist. Id. at 572. X-rays of the wrist were normal and there was soft tissue calcification in the elbow. Id. at 573-74. PA Milham told Plaintiff to continue with therapy in June and July 2016. Id. at 574, 579. There are no further records for this injury from Upper Bucks Orthopaedics.

On January 19, 2018, Plaintiff reported slipping on ice two days prior, injuring her right knee and ankle. Tr. at 580. X-rays showed a nondisplaced fracture of the right fibula. Id. at 581. Ernest E. Cope, M.D., at Upper Bucks Orthopaedics, put the ankle in a short leg cast on January 19, 2018. Id. The following week, Dr. Cope told Plaintiff she could begin partial weight-bearing as tolerated. Id. at 585. On February 15, 2018, x-rays showed "excellent fracture alignment [with no] significant fracture callus formation noted." Id. at 591. However, due to Plaintiff's pain, Dr. Cope continued treatment with the short-leg cast. Id. at 592. On March 1, 2018, Dr. Cope removed the cast, prescribed a brace and physical therapy. Id. at 594. Due to ongoing pain, Dr. Cope ordered an MRI,

id. at 598, which showed the fracture was in good alignment and healing.  Id. at 603.  On

May 17, 2018, Plaintiff reported the ankle was gradually feeling better with occasional

discomfort.  Id. at 606.  In July 2018, Plaintiff reported continued improvement with

discomfort with certain activities.  Id. at 609.[11]

Plaintiff returned to Dr. Cope on September 14, 2018, complaining of left

ankle/heal pain.  Tr. at 612.  The doctor noted that the pain seemed to be "at the insertion

of her Achilles tendon."  Id.  X-rays were normal, and the doctor prescribed anti-

inflammatories and physical therapy.  Id. at 614.  When the symptoms had not abated on

October 19, 2018, Dr. Cope ordered an MRI, id. at 615, which revealed Achilles

tendinitis.  Id. at 474, 621.  Dr. Cope continued Plaintiff's physical therapy and

recommended she use a knee scooter part time to rest the Achilles tendon.  Id. at 622.

On September 10, 2019, Plaintiff returned to Dr. Cope, complaining of bilateral

knee pain and left ankle pain after falling from an electric scooter.  Tr. at 631.  X-rays

showed evidence of mild degenerative arthritis in both knees, but no fracture of the knees

or left ankle.  Id. at 632.  Dr. Cope ordered MRIs, which revealed that the ACL graft in

the left knee was torn and there was severe degenerative arthritis in the lateral

compartment with no evidence of a lateral meniscus.  Id. at 627-28, 633.  The MRI of the

right knee revealed a nondisplaced fracture of the lateral tibial plateau and proximal

fibula.  Id. at 629, 633.  Dr. Cope explained that the right knee did not require

intervention, but the severe arthritis in the left knee rendered Plaintiff a candidate for

---

[11]At a subsequent visit in September 2018, related to a different injury, Dr. Cope
noted that her right ankle was "doing okay."  Tr. at 612.

knee replacement.  Id. at 634.  Although the record does not contain operative notes or treatment notes after the surgery, Plaintiff testified at the hearing that she underwent knee replacement surgery on December 4, 2019.  Id. at 44.

Plaintiff began treatment with Kim Kuhar, D.O., as her primary care physician on September 23, 2014.  Tr. at 378.  Dr. Kuhar noted diagnoses of allergic rhinitis, for which Plaintiff had been taking Zyrtec, Sudafed, and Nasonex, and the doctor prescribed Singulair;[12] depression for which she was followed by psychiatry and took Zoloft; a food allergy, which the doctor suspected was irritable bowel syndrome ("IBS") and recommended that she take a probiotic and fiber; hyperlipidemia which she managed with her diet; a left knee injury; myofascial pain syndrome for which the doctor referred Plaintiff to physical therapy; osteopenia for which the doctor ordered a DEXA scan and recommended calcium and vitamin D; weight gain for which the doctor recommended tracking her carbohydrate intake.  Id.

On March 26, 2015, Dr. Kuhar diagnosed Plaintiff with Hashimoto's thyroiditis, hypothyroidism, and a thyroid nodule, and began her on Synthroid.[13]  Tr. at 387.  On

---

[12]Sudafed contains acetaminophen, a pain reliever and fever reducer, and dextromethorphan, a cough suppressant.  See https://www.drugs.com/mtm/sudafed-pe-cold-and-cough.html (last visited Nov. 2, 2023); archived at https://perma.cc/Z85V-9UUT.  Nasonex is a steroid which prevents the release of substances in the body that cause inflammation, used to treat nasal symptoms of hay fever or other upper respiratory allergies.  See https://www.drugs.com/ nasonex.html (last visited Nov. 2, 2023); archived at https://perma.cc/DDH2-UC5X.  Singulair is a leukotriene inhibitor used to prevent asthma attacks and exercise-induced bronchoconstriction, and to treat symptoms of year-round allergies.  See https://www.drugs.com/singulair.html (last visited Nov. 2, 2023); archived at https://perma.cc/EVK5-V7M4.

[13]Synthroid (generic levothyroxine) is a thyroid medication which replaces a hormone normally produced by the thyroid gland, used to treat hypothyroidism.  See

June 29, 2015, NP Jennifer Broschart-Smith prescribed cipro, Zyrtec, and Mucinex for an upper respiratory infection.  Id. at 391.  On July 6, 2015, Nicole Oswald, M.D., added albuterol as needed for a persistent cough.  Id. at 394.[14]  On April 22, 2016, NP Broschart-Smith noted that Plaintiff's allergic rhinitis was chronic but stable on Singulair, Nasacort, albuterol when necessary, Zyrtec and Sudafed,[15] and that her depression was in full remission, having been on the same dose of Zoloft for 10 years.  Id. at 398.  Plaintiff complained about persistent fatigue and sleeping 12-15 hours a day.  Id. at 398-99.

On May 25, 2017, Plaintiff was again treated for sinus congestion and prescribed azithromycin[16] and NP Polly James recommended Mucinex.  Tr. at 423.  On July 25, 2017, Dr. Kuhar noted that Plaintiff had been in pain for "a long time" despite her physical therapy and treatment with Lyrica for six months.  Id. at 429.  Dr. Kuhar indicated that the chronic myofascial pain syndrome was "possibly fibromyalgia," and increased the dose of Lyrica.  Id.  Plaintiff saw NP Elizabeth Romeo on October 3, 2017,

---

https://www.drugs.com/synthroid.html (last visited Nov. 2, 2023); archived at https://perma.cc/S3T7-QUUE.

[14]Albuterol is a bronchodilator used to treat or prevent bronchospasm.  See https://www.drugs.com/albuterol.html (last visited Nov. 2, 2023); archived at https://perma.cc/M3PX-XB3G.

[15] Nasacort is a nasal spray containing triamcinolone, a corticosteroid that prevents the release of substances in the body that cause inflammation, used to treat the symptoms caused by seasonal allergies or hay fever.  See https://www.drugs.com/nasacort.html (last visited Nov. 2, 2023); archived at https://perma.cc/9NCD-P8FC.

[16]Azithromycin (brand name Z-Pak) is an antibiotic used to treat infections, including respiratory infections.  See https://www.drugs.com/azithromycin.html (last visited Nov. 2, 2023); archived at https://perma.cc/HAB3-B6ST.

for a sinus infection and prescribed azithromycin.  Id. at 436.  On December 13, 2017, Plaintiff was again treated for a sinus infection, with a prescription for azithromycin and Mucinex.  Id. at 443.  NP James noted Plaintiff's fibromyalgia/chronic pain syndrome were stable on Lyrica, and her hypothyroidism was stable.  Id.

At Plaintiff's Health Maintenance Examination on January 10, 2018, Dr. Kuhar noted that Plaintiff was taking Lyrica for chronic pain syndrome/fibromyalgia/ osteoarthritis of the knee, but that she was unable to tolerate a higher dose of Lyrica due to side effects (sedation and "brain fog").  Tr. at 449, 451.  The doctor noted, "given the complexities of her medical problems and her chronic pain, she has been unable to work and it does not appear that she would be able to work at this point."  Id. at 449.

On August 6, 2018, Dr. Kuhar saw Plaintiff for complaints of hair loss, weight gain, fatigue, tiredness and worsening of her generalized pain syndrome.  Tr. at 462.  The doctor again stated that she did not believe Plaintiff could sustain employment due to her pain and physical limitations, and gave her a handicapped application for parking because "she had great difficulty walking any significant distance."  Id. at 460.  The record contains a letter dated February 16, 2020, authored by Dr. Kuhar, in which she opined that Plaintiff "is physically unable to return to full time employment."  Id. at 724.

Plaintiff's treating endocrinologist, Diane Schmidt, M.D., noted in her August 1, 2018 progress notes that Plaintiff's thyroid function tests were normal, and she continued Plaintiff on the same dose of levothyroxine and ordered additional bloodwork in light of Plaintiff's recent hair loss and weight gain.  Tr. at 481.

Throughout the relevant period, Plaintiff participated in physical therapy at the Damany Center.  See tr. at 509 (summary dated 1/31/19).  However, the treatment notes contained in the record post-date the expiration of Plaintiff's insured status.  Id. at 695-711 (10/3/19 - 1/22/20).  In addition, physical therapist ("PT") Suparna Damany provided two letters post-dating the expiration of Plaintiff's insured status regarding her treatment. See id. at 509 (1/31/19), 624, 640 (11/19/19).  In the January 2019 letter, PT Damany stated that Plaintiff has pain in her arms, neck, upper and lower back, hips, legs and feet, and demonstrates tightness in the tissues throughout her body, limited range of motion, and muscle strength deficits.  Id. at 509.  PT Damany indicated that Plaintiff could not walk more than 10 minutes, has poor balance, persistent fatigue and difficulty functioning.  Id.  PT Damany opined that Plaintiff was unable to work in any capacity due to debilitating pain which limits her activities of daily living.  Id.  The November 2019 letter is a response to the initial determination finding Plaintiff not disabled, noting inconsistencies between that finding and PT Damany's findings.  Id. at 624.

Records from the otorhinolaryngology department of the University of Pennsylvania Health System show that Plaintiff was treated for chronic sinusitis beginning in 2011.  Tr. at 668.   In the notes from Plaintiff's January 3, 2018 visit, David Kennedy, M.D., prescribed budesonide.[17]  Id. at 677.  On January 2, 2019, a sinonasal

---

[17]Budesonide nasal spray is used to treat symptoms of seasonal or year-round allergies.  See https://www.drugs.com/mtm/budesonide-nasal.html (last visited Nov. 2, 2023), archived at https://perma.cc/9CC5-M655.

endoscopy found that Plaintiff's sinuses were clear, and NP Christine Reger continued Plaintiff on budesonide.  Id. at 672-73.

On February 11, 2019, Kira Shteinberg, N.P., conducted a consultative Internal Medical Examination, tr. at 521, noting that Plaintiff's gait and stance were normal, but she was unable to squat due to knee pain.  Id. at 523.  NP Shteinberg found that 5 of 18 trigger points were positive for sensitivity, and Plaintiff had 5/5 strength in upper and lower extremities.  Id. at 524.  She diagnosed Plaintiff with fibromyalgia, depression, anxiety, myofascial pain syndrome, and Hashimoto's thyroiditis.  Id.  In her RFC assessment, NP Shteinberg concluded that Plaintiff could continuously (over 2/3 of the time) lift and carry up to 20 pounds, sit for 8 hours a day in 1 hour increments, and stand and walk for 8 hours each in 2 hours increments.  Id. at 526-27.  Plaintiff required a cane for ambulation, but could use her free hand to carry small objects.  Id. at 527.  NP Shteinberg completed the Range of Motion Chart indicating that all movement was within normal limits.  Id. at 532-33.

On the same date, Brook Chrichlow, Psy.D., conducted a consultative Mental Status Evaluation, finding that Plaintiff's affect and mood showed moderate depression and her attention and concentration were mildly impaired.  Tr. at 512-15.  Dr. Crichlow noted that Plaintiff had received private mental health care services in 2008 and 2009, but during the relevant period received psychiatric medication from her primary care physician.  Id. at 512.  She diagnosed Plaintiff with major depressive disorder, recurrent, and unspecified anxiety disorder.  Id. at 515.  The doctor found Plaintiff had no limitation in understanding, remembering and carrying out simple instructions and making simple

judgments on work-related decisions, and mild limitation in the abilities to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions.  Id. at 516.  In addition, Dr. Crichlow found that Plaintiff had moderate limitations in her abilities to interact appropriately with the public, supervisors, and co workers and respond appropriately to usual work situations and changes in the routine work setting.  Id. at 517.

On February 21, 2019, at the initial consideration stage, based on his review of the record, Louis B. Bonita, M.D., found that Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds, sit for 6 hours in an 8-hour day, and stand/walk for 6 hours in an 8-hour day, and noted that Plaintiff was limited in the use of her left lower extremity in using foot controls.  Id. at 78.  Also at the initial consideration stage, Jon Rohar, Ph.D., found based on his review of the record that Plaintiff had mild limitations in her abilities to understand, remember, or apply information, and concentrate, persist, or maintain pace, and moderate limitation in the abilities to interact with others and adapt or manage oneself.  Tr. at 76.

On February 11, 2020, PT James Smith conducted a physical RFC assessment at the request of Dr. Kuhar.  Tr. at 712.[18]  PT Smith opined that Plaintiff could perform the physical demands of sedentary work but would be unable to perform full-time work because she was limited to working 6 hours and 5 minutes a day (sitting 4 hours and 58

---

[18]This assessment occurred when Plaintiff was recovering from knee replacement surgery that occurred on December 4, 2019.

minutes at 50 minute intervals and standing 1 hour and 51 minutes 20 minutes at a time).
<u>Id.</u> at 712-13.

    **D.**    **Plaintiff's Claims**

        1.    <u>Evaluation of Medical Evidence</u>

Plaintiff claims that the ALJ erred by failing to give sufficient weight to Plaintiff's physicians' reports, Doc. 10 at 6-7, and argues that, applying the updated regulations, the ALJ erred because Plaintiff's "extensive treatment and documentation supports that the medical testimony should control the case."  Doc. 10 at 8.  Defendant responds that Plaintiff relies on an outdated regulation pertaining to the weight of medical opinions and does not identify which opinions the ALJ improperly considered, and that substantial evidence supports the ALJ's evaluation of the opinion evidence.  Doc. 13 at 6-12.

Before addressing Plaintiff's challenge to the ALJ's consideration of the medical evidence, I must first address the regulatory scheme governing such consideration.  In her brief, Plaintiff begins by referring to the "weight" given to certain medical opinion evidence and suggesting that treating physicians' opinions are entitled to controlling weight, citing a previously applicable regulation.  Doc. 10 at 6-7.[19]  The social security regulations were revised to abandon the concept of evidentiary weight and focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or
> prior administrative medical finding(s), including those from
> your medical sources.

---

[19]Later in the brief, Plaintiff does refer to the proper standard and governing regulation.  Doc. 10 at 7-8.

20 C.F.R. § 404.1520c(a).[20]  This regulation lists the factors to be utilized in considering

medical opinions:  supportability, consistency, relationship including the length and

purpose of the treatment relationship and frequency of examinations, specialization, and

other factors including familiarity with other evidence in the record or an understanding

of the disability program.  Id. § 404.1520c(c).  The most important of these factors are

supportability and consistency, and the regulation requires the ALJ to explain these

factors, but does not require discussion of the others.  Id. § 404.1520c(b)(2).  The

regulation explains that "[t]he more relevant the objective medical evidence and

supporting explanations presented by a medical source are to support his or her medical

opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id.

§ 404.1520c(c)(1).  In addition, "[t]he more consistent a medical opinion(s) . . .  is with

the evidence from other medical sources and nonmedical sources . . . , the more

persuasive the medical opinion(s) . . . will be."  Id. § 404.1520c(c)(2).

     Here, Plaintiff generally argues that the ALJ did not afford the opinions of her

treatment providers sufficient weight, without identifying to which specific opinions she

is referring, and complains that "[t]he ALJ may not ignore these medical reports that

conclusively show that Plaintiff is unable to perform her past work or any other work."

---

    [20]The new regulation applies to cases filed on or after March 27, 2017, 20 C.F.R.
§ 404.1520c, which includes Plaintiff's application filed on July 31, 2018.

Doc. 10 at 8.[21]  Defendant responds that the ALJ properly evaluated the opinion

evidence.  Doc. 13 at 9-12.

As noted in the record summary, Dr. Kuhar opined on three occasions that

Plaintiff was not able to work.  Tr. at 449 (1/10/18), 460 (8/6/18), 724 (2/16/20).  The

ALJ found that these statements were not persuasive.

> In January 2018, treating provider [Dr.] Kuhar . . . indicated
> that given the complexities of her medical problems and her
> chronic pain, [Plaintiff] has been unable to work and it does
> not appear that she would be able to work at this point.  In
> August 2018, she made a similar statement stating that for
> medical reasons, the patient is unable to sustain significant
> gainful employment secondary to her physical limitations
> The opinions are not persuasive as they lack a function by
> function analysis of what [Plaintiff] could still do despite her
> impairments.  Additionally, Dr. Kuhar's corresponding
> progress notes simply do not support her overall conclusion.
> Her objective findings show such things as normal ranges of
> motion, stable depression, improvement with treatment,
> normal reflexes, no edema or deformity, and a normal gait
> and neurovascular exam.
>
> Dr. Kuhar submitted a February 2020 statement that indicates
> according to the reports from the physical therapist and her
> experience with this patient, she is physically unable to return
> to full time employment.  The opinion is again not persuasive
> for the reasons set forth above.  Further, it is well beyond
> [Plaintiff's] DLI, though she attempts to relate it back to her
> functioning since.  This is also somewhat inconsistent with
> [Plaintiff's] own statements regarding functioning and her
> acknowledgement at the hearing of some improvement when
> compared to her past symptoms.  Lastly, the undersigned
> notes that Dr. Kuhar alleges significant anxiety and

---

[21]Based on this description, it appears Plaintiff is referring to the findings of
disability noted by Plaintiff's primary care physician, Dr. Kuhar, and her treating
physical therapist, PT Damany.  The quote from Plaintiff's argument incorrectly implies
that the ALJ found her capable of performing her past relevant work, as the ALJ
specifically found that Plaintiff could not perform her past relevant work.  Tr. at 28.

> depression to support her conclusions, which is grossly
> negated by her own treatment notes which reflect psychiatric
> stability.

Tr. at 26-27 (record citations omitted).

The ALJ's assessment of Dr. Kuhar's opinions is supported by substantial evidence. As noted, one of the factors that the ALJ must address is supportability -- the more an opinion is supported by objective medical evidence and supporting medical evidence, the more persuasive the opinion. 20 C.F.R. § 404.1520c(c)(1). In the January 2018 statement, Dr. Kuhar cited Plaintiff's medical problems and chronic pain as the basis for her inability to work. Tr. at 449. However, a thorough review of the record reveals that, other than pain and limitation of motion due to acute injuries, Dr. Kuhar's notes evidence primarily normal ranges of motion, gait, and station. See, e.g., id. at 381 (9/23/14 - only musculoskeletal notation involved left knee related to meniscus tear), 384 (10/29/14 - denies back and joint pain, joint swelling, limited range of motion, muscle aches, weakness, and stiffness; gait and station normal), 393 (6/29/15 - gait and station normal), 401 (4/22/16 - gait and station normal), 443 (12/13/17 - fibromyalgia and chronic pain syndrome noted as stable on pregabalin), 464 (8/6/18 - extremities normal except tenderness in right knee and multiple trigger points in neck, arms, thighs). Dr. Kuhar's notes also indicate that Plaintiff's depression was in full remission and stable on Zoloft. See, e.g., id. at 398 (4/22/16), 449 (1/10/18). Thus, Dr. Kuhar's notes do not support a finding of disability.

Dr. Kuhar's conclusions are also inconsistent with other evidence in the record. For example, although Dr. Schmidt, Plaintiff's treating endocrinologist, noted Plaintiff's

complaints of pain in her wrists, hips, knees, and neck, tr. at 481 (8/1/18), on

examination, the doctor noted normal range of motion of the neck and the

musculoskeletal examination revealed "[n]ormal range of motion.  She exhibits no edema

or deformity."  Id. at 483.  In addition, during the February 11, 2019 consultative

examination, N.P. Shteinberg noted Plaintiff's joints were stable and nontender, that 5 of

18 trigger points were positive, her gait was normal, she had no difficulty getting on and

off the exam table, and her extremity and grip strength were 5/5.  Id. at 523-24.[22]  Thus, I

find no error in the ALJ's consideration of Dr. Kuhar's opinion regarding disability.

With respect to PT Damany, the ALJ also found her opinion not persuasive.

> In January 2019, [PT] Damany . . . indicated that she had seen
> the patient since 2015 and [Plaintiff] cannot walk greater than
> 10 minutes without a break, has an antalgic gait, has poor
> balance, difficulty functioning, cannot sit greater than 15min
> without change in position, and is unable to work in any
> capacity due to constant debilitating pain ([tr. at 509]).
> Similar conclusions were rendered in November 2019 ([id. at
> 624-39, 640-42]).  The opinions are not persuasive as they are
> not supported by any corresponding treatment records prior to
> [Plaintiff's DLI].  The only records from this source begin in
> late 2019 ([id. at 624-39, 695-711]).  Also, the records are
> inconsistent with [Plaintiff's] own stated activity level and the
> other treating and evaluating source examinations as
> discussed above.  Ms. Damany included MRI's and ortho
> progress notes beginning in September 2019 as support which
> is after the date last insured.  Of note, those orthopedic
> progress notes even state that the onset date of the bilateral
> knee pain that was causing severe restrictions and ultimately a

---

[22]The ALJ acknowledged Plaintiff's complaints of pain and limitations related to her September 2019 injury, ultimately requiring the replacement of her left knee.  Tr. at 25 (citing id. at 662, 695-711).  However, this evidence post-dates the expiration of Plaintiff's insured status, as the ALJ noted.

> knee replacement was September 2019, not back to 2013 or
> her DLI.

Id. at 27.

The ALJ's determination is supported by substantial evidence.  Despite PT

Damany's statement that she had treated Plaintiff since 2015, the only treatment notes

from the Damany Center contained in the record post-date the September 2019 injury to

Plaintiff's left knee requiring a knee replacement, and therefore post-date the expiration

of Plaintiff's insured status (December 31, 2018).  Tr. at 695-711 (10/3/19-1/22/20).[23]

Similarly, the assessment performed by PT James Smith, id. at 712-22, was not

conducted until February 13, 2020, more than a year after the expiration of Plaintiff's

insured status and five months after the injury to her left knee requiring replacement.

Additionally, as the ALJ concluded, the limitations noted by PT Damany are

inconsistent with Plaintiff's activities during the relevant period.  For example, PT

Damany opined that Plaintiff is unable to sit due to neck pain, low back and hip pain, and

pelvic dysfunction.  Tr. at 625.  However, Plaintiff testified that with her mobility scooter

she could sit and get around places "where you have to be on your feet for a long period

of time," "like the mall or an auto race," id. at 54, contradicting PT Damany's assessment

that Plaintiff is unable to sit.  Similarly, PT Damany noted that Plaintiff has difficulty

putting her shoes on, id. at 509, yet Plaintiff did not mention any such difficulty in her

---

[23]PT Damany noted limitations, including gait dysfunction, limited range of
motion throughout, and reduced extremity and grip strength, see tr. at 509, 624-26, but
these are inconsistent with Dr. Kuhar's examination findings, and those of Dr. Schmidt
and NP Shteinberg, as previously discussed.

Function Report and indicated that she usually prepares her own simple breakfast and lunch, folds clothes, loads and unloads the dishwasher, gathers the trash, does light surface cleaning, and uses a riding mower in the yard, id. at 241-42, and testified that she dresses herself without any mention of difficulty.  Id. at 56.  Thus, I conclude the ALJ did not err in her consideration of PT Damany's assessments of disability.

2.     Evaluation of Plaintiff's Subjective Complaints

Plaintiff also argues that the ALJ failed to properly evaluate her subjective complaints.  Doc. 10 at 9-11.  Defendant responds that the ALJ properly considered Plaintiff's subjective complaints and conducted a thorough analysis, and crafted an RFC assessment that accommodated the functional limitations supported by the record.  Doc. 13 at 13-18.

Social Security regulations require a two-step evaluation of subjective symptoms: (1) a determination as to whether there is objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged; and (2) an evaluation of the intensity and persistence of the pain or symptoms and the extent to which they affect the individual's ability to work.  20 C.F.R. § 404.1529(b) & (c); Social Security Ruling ("SSR") 16-3p, Titles II and XVI:  Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, at *3-4 (Mar. 16, 2016).  Third Circuit case law does not require an ALJ to accept a plaintiff's complaints concerning her symptoms, but rather requires that they be considered.  See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011).  An ALJ may disregard subjective complaints when contrary evidence exists in the record, see Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir.

1993); see also Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence."). SSR 16-3p requires the ALJ to consider all the evidence in determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *4-7. In addition to the medical evidence, SSR 16-3 p requires the ALJ to consider the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication the claimant uses to alleviate the symptoms; treatment, other than medication, the claimant has received; other measures the claimant has used to alleviate the symptoms; and any other factors. SSR 16-3p, 2016 WL 1119029, at *7; see also 20 C.F.R. § 404.1529(c)(3) (listing same factors).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. at 23. The ALJ considered the factors listed in SSR 16-3p and section 404.1529(c)(3), but found they supported less restriction than claimed by Plaintiff.

> In sum, the above [RFC] assessment is supported by the analyses of the above medical opinions, the objective medical evidence of record, [Plaintiff's] testimony, and documented subjective reports. Although [Plaintiff] has some limitations due to impairments, as summarized above, the record reflects that there is little diagnostic evidence to support the severity of [Plaintiff's] alleged physical limitations, improvement is

> noted upon physical examination, and [Plaintiff's] activity level/capabilities are somewhat inconsistent with the alleged severity of her symptoms.  She initially stopped working due to her job being eliminated and many of the symptoms she alleged were present when she worked without precluding her from the same.  Her pain was not intractable, nor required sustained specialty pain management treatment.  Her fatigue, though well documented, did not significantly hinder her routine activities of daily living and she was able to get many functions completed including shopping, vacationing, using the computer to pay bills, socializing, and driving.  The assessed exertional level together with the additional non-exertional restrictions adequately accommodates her documented symptoms and limitations associated with all of her physical conditions during the relevant period.  Lastly, [Plaintiff's] significantly limited mental health treatment history and largely normal mental status exam findings tend to suggest that these symptoms were not as severe as has been alleged.  The restriction to simple, routine tasks adequately considers her moderate attentional deficits when further considering the subjective reports of brain fog and poor concentration.

Id. at 28.

The ALJ's consideration of Plaintiff's subjective complaints is supported by substantial evidence.  Here, the ALJ thoroughly reviewed the evidence in her decision and incorporated the factors listed in section 404.1529(c)(3) and SSR 16-3p in her discussion.  Id. at 22-28.

Plaintiff contends that each of the factors listed in SSR 16-3p and section 404.1529(c)(3) favors a finding of disability.  Doc. 10 at 10-11.  This is not wholly accurate.  With respect to Plaintiff's activities, the ALJ correctly noted that Plaintiff indicated that she went grocery shopping with her husband once a week, tr. at 243, vacationed, id. at 631 (9/10/19 - fell from scooter in Watkins Glen, New York), 580

(1/19/18 - slipped on ice in New Orleans), 558 (10/14/14 - knee gave out while vacationing in Texas), pays her bills and handles her checking account, and drives short distances.  Id. at 243.  In addition, in her Function Report, she stated that she does laundry, folds clothes, loads and unloads the dishwasher, and does light surface cleaning. Id. at 242.  The ALJ properly relied on Plaintiff's activities in considering the limitations imposed by her impairments.

In considering the intensity of Plaintiff's pain and the effectiveness of her medication, the ALJ correctly observed that Plaintiff's pain was not intractable and did not require specialty pain management treatment.  Tr. at 28.  The ALJ noted that Plaintiff testified that her average pain level on Lyrica was a 3 out of 10, id. at 22; see also id. at 50.  Similarly, at the time of the consultative examination, Plaintiff told NP Shteinberg that she takes Lyrica for her fibromyalgia, and her pain was primarily in her wrist at a 3 out of 10 that day and that when it got unbearable she takes ibuprofen.  Id. at 521.  The ALJ also acknowledged the "brain fog" Plaintiff described as a side effect of Lyrica and Zoloft, id. at 21, 28; see also id. at 55, 451, but noted that the mental status examinations established that Plaintiff's attention and concentration were only mildly impaired and noted Plaintiff's reported activities of doing crossword puzzles and reading.  Id. at 21, 28.

In short, the ALJ considered Plaintiff's subjective complaints and, after a thorough discussion of the evidence, including Plaintiff's treatment, effectiveness and side effects of medication, and Plaintiff's daily activities, found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her impairments were not entirely

consistent with the evidence in the record.  The ALJ's conclusion is supported by substantial evidence.

## IV.   <u>CONCLUSION</u>

The ALJ properly evaluated the opinions from Plaintiff's treating physicians, utilizing the correct standard and her decision in this regard is supported by substantial evidence.  In addition, the ALJ properly considered Plaintiff's subjective complaints in determining the RFC assessment, including the factors listed in section 404.1529(c)(3) and SSR 16-3p, and her determination is supported by substantial evidence.

An appropriate Order follows.